# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 25, 2025 Session

## STATE OF TENNESSEE v. PARVEL GUDGER

**Appeal from the Circuit Court for Cocke County**
**No. 9430     Carter Scott Moore, Judge**

**No. E2023-01798-CCA-R3-CD**

FILED

JUN 2 3 2025

Clerk of the Appellate Courts
REc'd By

The Defendant, Parvel Gudger, was convicted by a Cocke County jury of aggravated sexual battery, continuous sexual abuse of a child,[1] rape of a child, and incest, for which he received an effective sentence of fifty-two years' incarceration. On appeal, the Defendant argues that (1) the trial court erred in denying his motion to suppress his confession, (2) the trial court erred in admitting a recording of the victim's forensic interview, (3) the evidence adduced at trial was insufficient to sustain his convictions, and (4) his sentence is excessive. We ordered supplemental briefing to address whether the State's elections of offenses were sufficient to protect the Defendant's right to a unanimous jury verdict for the charges of rape of a child and incest. Following our review, we conclude that the State failed to elect an offense as to the rape of a child and incest charges and that this failure resulted in plain error. Accordingly, we reverse the Defendant's convictions for rape of a child and incest and remand for a new trial on those charges. We otherwise affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Affirmed in Part;
### Reversed and Remanded in Part

W. MARK WARD, SP. J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Rebecca V. Lee, District Public Defender; and Keith E. Haas, Assistant District Public Defender, for the appellant, Parvel Gudger.

---

[1] As discussed more fully below, the trial court dismissed the Defendant's conviction of continuous sexual abuse of a child following the Defendant's trial but prior to the Defendant's sentencing hearing.

Jonathan Skrmetti, Attorney General and Reporter; Abigal H. Hornsby, Assistant Attorney General; Jimmy Dunn, District Attorney General; and Mark B. Strange and S. Joanne Sheldon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural History

On October 30, 2020, a Cocke County grand jury returned an indictment charging the Defendant with three counts of incest, two counts of rape, and one count each of aggravated assault, aggravated sexual battery, rape of a child, and continuous sexual abuse of a child. These charges involved two victims, H.G. and K.M.[2] The Defendant filed a successful motion to sever the offenses, and the State proceeded to separate trials on the offenses specific to each victim. This appeal arises from the Defendant's trial on the charges of aggravated sexual battery, continuous sexual abuse of a child, rape of a child, and incest, as they related to H.G.[3] Following pretrial evidentiary hearings, the Defendant's trial commenced on August 17, 2022.

### A. Trial

The victim's mother, S.M., testified that she and the Defendant divorced in 2018, and that the Defendant was the victim's father. Shortly after the divorce, the Defendant sought treatment for drug addiction at a rehabilitation facility in Savannah, Tennessee. Following the Defendant's completion of a recovery program, S.M. began allowing the Defendant to visit her and their children in Newport. By July 2020, S.M. and the Defendant called to talk to each other every night. Around this same time, S.M. purchased a new house ("the new house"), also in Newport, which she intended to renovate before moving in along with her children.

S.M. recalled that late in the evening of July 18 or 19, 2020, she and the victim sat together in bed while S.M. spoke to the Defendant on her cell phone. During their conversation, S.M. handed her cell phone to the victim and invited the Defendant to tell the victim goodnight. In response, the victim "handed the phone back" to S.M. and moved to hide behind her mother. S.M. ended the phone call shortly thereafter and asked the victim what was wrong. The victim began crying and told S.M. that the Defendant had raped her on multiple occasions and in several locations. The victim stated that these rapes

---

[2] It is the policy of this court to refer to minor victims by their initials to protect their privacy.

[3] To further protect her privacy, we will hereinafter refer to H.G. as "the victim" and to her relatives by their initials.

- 2 -

generally occurred while S.M. was either away from home or taking a bath. S.M. comforted the victim until she fell asleep and then called her parents and the police.

S.M. also recalled that the victim described a rape which occurred at the new house, which S.M. found peculiar because she had not yet moved into the new house. She averred that she "couldn't figure[] out how" the victim and the Defendant would have entered the new house. S.M. questioned the victim to this effect, but the victim "didn't have an answer to that." S.M. was unsure whether the Defendant had a key to the new house.

On cross-examination, S.M. testified that the Defendant moved out of her home several months before the finalization of their 2018 divorce. She recalled that the Defendant completed his recovery program between August 16 and November 15, 2019, and that he was later hired as a counselor at the same rehabilitation facility.

S.M. testified that the Defendant visited her and their children on the weekend of July 4, 2020. She averred that this was "possibly" the first time he visited after completing his recovery program. The Defendant did not have a vehicle at the time, so S.M. rented a car for him to drive to Newport. S.M. recalled that the victim was around ten years old at the time of the Defendant's visit and was experiencing "hygiene problems." S.M. testified that she asked the Defendant to speak to the victim about these problems, but she was unsure whether he did so. She did not recall noticing anything inappropriate between the Defendant and the victim during his July 4, 2020 visit.

During her conversation with the Defendant on July 18 or 19, 2020, S.M. noticed that the victim was "doing something" on her cell phone, so she took the victim's cell phone and began "scrolling through" it. From her search of the victim's cell phone, S.M. learned that the victim had been talking to "a stranger" about "roleplaying." S.M. also recalled that the victim used her TikTok account "quite a bit" during this time and had accumulated hundreds of followers.

The morning after the victim told S.M. that the Defendant had raped her, S.M. took the victim to Safe Harbor Child Advocacy Center ("Safe Harbor") in Sevierville. There, the victim recounted her allegations against the Defendant in a forensic interview and underwent a physical evaluation by a doctor. Several days later, officers from the Newport Police Department ("NPD") visited S.M.'s home to collect the victim's cell phone, laptop, iPad, and several pieces of her clothing for examination.

A recording of the victim's July 19, 2020 forensic interview was played for the jury. Before she began the interview, Jennie Stith identified herself as a Safe Harbor employee and stated that she would be interviewing the victim. In her interview, the victim stated that she was ten years old, that she would soon begin fourth grade, and that she lived with

- 3 -

her mother, brother, and sister. She also noted that the Defendant had previously lived with her but that he was now employed in Savannah. The victim stated that the Defendant occasionally visited the family in Newport.

The victim stated during her forensic interview that the Defendant "would touch me in places he shouldn't," which she later identified as her breasts and her vagina. The victim was unable to clearly remember the first time the Defendant inappropriately touched her, but she believed that it began when she was either in kindergarten or first grade. She recalled one occasion in which the Defendant asked her to lay down with him while he watched television and forced her to touch his penis "under the covers." The victim stated that she did not see the Defendant's penis until she was in the second grade, when the Defendant began forcing her to perform oral sex on him. She recalled that the Defendant would rub the "white stuff" that came out of his penis into the floor. The victim said this made her feel "weird" and, though she did not want to do as the Defendant asked, she was afraid she would get in trouble if she refused. She explained that she once asked the Defendant why he asked her to do these things, to which the Defendant responded that she was not yet old enough to understand and that she "could get in big trouble" if she told anyone.

The victim said that the Defendant usually asked her to touch his penis or to perform oral sex on him while S.M. was away from home or in the bathroom. She estimated that this occurred about every one or two weeks. She also recalled that the Defendant inserted his fingers into her vagina during these encounters and that his fingernails "would scratch in[side] me."

During her interview, the victim described several occasions in which the Defendant touched her vagina. In one, she recalled that S.M. nearly caught the Defendant touching her vagina while the two laid on the couch together, but the Defendant "quickly" removed his hand when S.M. entered the room. In another, the Defendant touched the victim's vagina while he showed her pornographic videos on the television. She further stated that approximately a year previously, the Defendant asked her to take a picture of her vagina on her iPad, but the victim refused to do so.

When asked to describe the last time the Defendant inappropriately touched her, the victim stated that during the Defendant's most recent visit to her home, he removed his penis from his underwear, placed his hands on the victim's head, and forced her to perform oral sex on him. She stated that the Defendant otherwise remained clothed and that she was fully clothed. She described this rape as occurring in S.M.'s master bedroom while S.M. took a bath. When asked when this rape occurred, the victim maintained that it happened "the last time [the Defendant] came to visit," which she described as a weekend visit. She averred that this visit was "like last month," though she was unsure precisely

when and noted that she did not "really check the months." Later in the interview, the victim stated she did not remember any such encounters occurring anywhere besides S.M.'s bedroom and on the couch.

The victim requested to stop talking about the Defendant, and Ms. Stith took a break in the interview. When the interview resumed, Ms. Stith again asked the victim to describe the last time "it happened," to which the victim responded that S.M. "was in the bath, and I was in [her] room." Ms. Stith then asked whether the Defendant had ever inappropriately touched her outside of her home, and the victim agreed that he had. The victim described another occasion in which she accidentally broke the Defendant's "controller." The Defendant told the victim that they would "go on a ride," and he drove her to the new house. Though she was unsure of the new house's address, she provided a general description of its location and noted that it was "not far from our old house that we've been living in." When they arrived at the new house, the Defendant took the victim inside, touched her vagina, and made her touch his penis. She later recalled that the Defendant also attempted to put his penis inside her vagina while they were at the new house and that he "kept on trying to do that" until she told him to stop. The victim did not believe that the Defendant's penis entered her vagina, but she noted that it hurt. The victim then described this encounter as the last time the Defendant sexually touched her.

At trial, the victim identified herself and Ms. Stith in the recording of her forensic interview and testified that everything she said during the interview was true. On cross-examination, the victim testified that prior to trial, she had most recently seen the Defendant during his July 4, 2020, visit. She recalled that the Defendant drove her to the new house during this visit, though she did not remember whether he discussed her "hygiene" with her. She testified that she was unsure whether the Defendant last raped her in S.M.'s bedroom while S.M. took a bath or at the new house. Nevertheless, she stated that the rape at S.M.'s new house was "one of the last times that it happened." She explained that her memory was "fuzzy" on the issue.

The parties stipulated that NPD Officer Brandon Cassady responded to S.M.'s 911 call on the morning of July 19, 2020. Officer Cassady interviewed S.M., who told him that on the previous night, she had looked through the victim's cell phone and found a link to a pornographic website as well as potentially sexual messages between the victim and a stranger discussing "roleplay." Afterwards, the victim made a "disclosure" to S.M., and S.M. called the police the following morning.

NPD Detective Derrick Webb testified that he responded to S.M.'s 911 call along with Officer Cassady. After interviewing S.M., Detective Webb contacted the Department of Children's Services and later attended the victim's forensic interview at Safe Harbor. On October 30, 2020, Detective Webb and Detective Jason Ramsey interviewed the

Defendant in the jury room of the Cocke County courthouse. A recording of the Defendant's interview was played for the jury.

The recording of the Defendant's interview depicted him sitting at a table and speaking to Detectives Ramsey and Webb, who were seated off-camera. Prior to the interview, the Defendant waived his Miranda rights and agreed to speak with the detectives. Detective Ramsey then stated that "two girls" had given forensic interviews in which they both "told a pretty in-depth story" alleging that the Defendant had raped them. Detective Ramsey also noted that there was "evidence from cell phones, tablets, [and] clothing" to substantiate the victims' claims. Detective Webb then informed the Defendant of his charges, and Detective Ramsey identified the victim as one of the "two girls." Detective Ramsey stated he remembered the Defendant from the Defendant's previous arrest and recalled that during that time, the Defendant was struggling with drug addiction, which he described as "the devil he had on his back." Detective Ramsey invited the Defendant to explain his side of the story and advised that he hoped the Defendant could get help if the allegations were true, though he noted that he did not intend to insinuate that they were.

The Defendant stated that he did not know how to respond to the charges against him. He agreed that he had been arrested in 2016 and noted that S.M. had subsequently forced him to move out of their home. Afterwards, the Defendant and S.M. mended their relationship, and in 2017, the Defendant moved back in with S.M. However, "everything started spiraling out of control again" in 2018, when the Defendant began using methamphetamine. He and S.M. separated again in April 2018, and the Defendant began a recovery program at a rehabilitation facility in Savannah in August 2019.

The Defendant stated that he did not see his children after he and S.M. separated until November 2019, when he visited the family to celebrate Thanksgiving. While at S.M.'s home, the Defendant decided to search for online job listings using an iPad the victim typically used. During this search, the Defendant checked the iPad's Internet search history and discovered recent searches for pornography. He confronted each of his children about these searches, and the victim ultimately confessed that she had made the searches. The Defendant recalled that both he and the victim felt embarrassed and that he advised the victim she was "too young to be looking at stuff like this." The Defendant did not tell S.M. about his findings because he did not want to further embarrass the victim.

The Defendant denied that he touched the victim in a sexual manner or that he watched pornography with her and maintained he did not understand the basis of the victim's allegations. Detectives Webb and Ramsey pressed the Defendant on this issue and asked why the victim would allege that her father attempted to rape her and, further, how she would know anything about pornography "unless she had seen something" pornographic previously. The Defendant stated the victim had always been interested in

- 6 -

"really weird stuff" and recalled that he had previously told S.M. that they needed to keep a closer watch on what the victim was searching for and watching on the Internet. He noted that he had not had any influence on his children's discipline since his 2016 arrest. The Defendant stated that "the only thing I can think of [to explain the victim's allegations] is her watching porn." He admitted that he watched pornography in private but denied that he ever used the victim's iPad to do so.

During the interview, Detective Webb stated, "I'm going to tip our hand a little bit more . . . we've recovered a bunch of clothes from [the victim] . . . what would you do if I told you that your semen was found on about two of those pieces of clothing?" The Defendant responded that any semen recovered from the victim's clothing had likely been transferred there from bathroom towels. He explained that he masturbated "pretty often," that he occasionally did so in his children's bathrooms, and that he cleaned himself afterwards using their bathroom towels which he discarded into their laundry hampers. Detectives Webb and Ramsey expressed their skepticism of this defense, and the Defendant responded, "I don't know what you want me to tell you." Detective Webb asked the Defendant to tell the truth and explained that the victim would have to testify against him during a trial, at which point she would be "maybe eleven." The Defendant then asked, "How long am I looking at?" Detective Ramsey estimated that the Defendant could receive a sentence of "a hundred years or more," "if you round everything on the minimum," but advised the Defendant that he may not be convicted as charged. Detective Ramsey stated that he would tell the district attorney general's office if the Defendant cooperated during his interview and that "if something happened, and you cooperate, there's a real, real good chance that the D.A.'s gonna work something out." He also recalled that a recent defendant had been similarly charged and received a sixty-year sentence.

The Defendant then requested a break in the interview and asked if he could smoke a cigarette. The detectives provided the Defendant with cigarettes and a Sprite during the break and opened a window to permit the Defendant to smoke during the break. While he did so, the detectives spoke casually and joked with one another until the Defendant stated that he did not want to spend the rest of his life in prison. After the Defendant finished smoking, he and the detectives returned to the interview table. The Defendant then asked whether the detectives could "help [him] not spend the rest of [his] life in prison." Detective Ramsey stated that he would immediately call the district attorney's office after the interview if the Defendant was cooperative and remorseful and noted that "cooperation goes a long way." The Defendant asked whether his charges could be reduced to "sexual misconduct," and Detective Ramsey responded that while it was possible that some of his charges could be reduced or dropped, that decision remained with the district attorney's office.

The Defendant then admitted that he had performed oral sex on the victim and touched her breasts. He denied that he ever asked the victim to perform oral sex on him or to touch his penis. He stated that he began performing oral sex on the victim when she began puberty, "probably two" years previously, and that he did so while he was under the influence of methamphetamine. He also admitted that he digitally penetrated the victim's vagina and that the victim complained once that his fingernails had scratched her. He estimated performing oral sex on the victim two or three times and stated that he masturbated while doing so at least once. He described these encounters as occurring within a timeframe of "a couple of months" in early 2018 and ending before April 2018. He denied "doing anything" with the victim during his visit during the weekend of July 4, 2020, and noted that he did not have a key to either S.M.'s home or to the new house.

The Defendant stated that he realized he "had to put a stop to" his sexual conduct with the victim after an encounter in which she asked him to perform oral sex on her. He stated that when he visited the victim in November 2019, he hoped she would "understand" that he had not been himself when he performed oral sex on her or inappropriately touched her.

He maintained that he never watched pornography with the victim. He explained that the victim was likely first exposed to pornography through S.M., averring that S.M. had likely used the victim's iPad to search for pornography following her separation with the Defendant. The Defendant described himself as a "chronic masturbator" and again stated that his semen was likely transferred to the victim's clothing from the bathroom towels he used to clean himself and discarded into her laundry hamper. Detective Webb wrote a summary of the Defendant's interview, which the Defendant signed.

On cross-examination, Detective Webb agreed that the Defendant denied the victim's allegations for the larger portion of an hour before he confessed following the break in the interview. He also agreed that he declined to record all the Defendant's denials and assertions in his summary of the interview. Detective Webb noted that he and Detective Ramsey had to "ramp up" their questioning to persuade the Defendant to confess. He described his statement regarding the presence of the Defendant's semen on the victim's clothing as an attempt to increase the "pressure" on the Defendant.

Detective Webb testified that during his interview with S.M. on July 19, 2020, S.M. stated that she had found pornography and discussions of sexual roleplaying on the victim's cell phone. On July 24, 2020, Detective Webb returned to S.M.'s home and collected the victim's cell phone, laptop, iPad, and several pieces of the victim's clothing, which he sent to the Tennessee Bureau of Investigation ("TBI") for examination. On December 22, 2020, Detective Webb received the results of this examination, which did not indicate the presence of any semen on the victim's clothing. Detective Webb agreed that he did not

- 8 -

know the results of this examination during his October 30, 2020, interview with the Defendant.

The State rested. The Defendant called Theresa Trice to testify on his behalf. Ms. Trice recalled that she and the Defendant had been friends since 2014 and that he had lived with her and her husband for a brief period in 2018 and again between January and August 2019. Ms. Trice testified that she drove the Defendant to and from work while he lived with her and that she also drove him to begin his stay at the rehabilitation facility in Savannah in August 2019.

The Defendant also elected to testify. The Defendant recalled feeling "blindsided" during his interview after learning of the charges against him, and that this confusion was compounded when the detectives told him they had evidence to substantiate the victim's allegations. He denied that he performed oral sex on the victim, digitally penetrated her vagina, or that he otherwise sexually touched her in any way. He maintained that any presence of his semen found on the victim's clothing came from towels he used to clean himself after masturbating. The Defendant explained that he provided a false confession during his October 30, 2020, interview because he felt intimidated and pressured to do so by Detectives Webb and Ramsey. He also stated that he confessed to "make it easier on my mother and my sister" once the victim's allegations became public. The Defendant testified he felt he had no future and had planned on committing suicide immediately after his interview.

The Defendant testified that he was convicted of misdemeanor theft in 2016 and that he and S.M. began having marital problems soon afterwards. S.M. confiscated his housekeys following his arrest and did not return them to him. She also did not give the Defendant a key to the new house. After his completion of his recovery program in Savannah, the Defendant began helping S.M. renovate the new house. He stated that he never visited the new house when S.M. was not present.

The Defendant reiterated that he believed the victim was "into weird things." He explained that he had found pornographic searches in the Internet search history on her tablet during his November 2019 visit and that the victim confessed she had made the searches. The Defendant recalled that he felt embarrassed and that he did not know how to handle the situation. He testified that he did not tell S.M. about the encounter because he did not want his first visit to his family after completing his recovery program to be marred by a negative experience.

The Defendant testified that during his visit to Newport on the weekend of July 4, 2020, S.M. asked the Defendant to talk to the victim about her "hygiene." He also recalled that S.M. was concerned that the victim was not completing her chores around the house

- 9 -

because she was "constantly" using her cell phone. Accordingly, the Defendant "took [the victim] for a ride down the street" and discussed her need to both take better care of her hygiene and to help S.M. by doing her chores. The victim responded by apologizing and stating that she understood. The Defendant denied that he went to the new house during his July 4, 2020, visit.

On cross-examination, the Defendant testified that Detectives Webb and Ramsey did not raise their voices, threaten him with physical harm, or hit the table during his interview. He described the tone of the interview as cordial and agreed that he was not forced to sign Detective Webb's summary of his confession at the conclusion of the interview.

The Defendant rested. Upon this proof, the jury convicted the Defendant as charged.

## B. Sentencing Hearing

The trial court held a sentencing hearing on January 10, 2023. Prior to the presentation of arguments, the State moved to dismiss the Defendant's conviction of continuous sexual abuse. The State noted that the parties had agreed that there was a "notice issue" particular to this conviction.[4] The trial court granted the motion.

The State introduced the Defendant's presentence report and a victim impact statement from S.M. The State requested that the trial court apply enhancement factor one, that the defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; enhancement factor four, that the victim of the offense was particularly vulnerable because of her age; enhancement factor seven, that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; and enhancement factor fourteen, that the defendant abused a position of public or private trust. Tenn. Code Ann. §§ 40-35-114(1), (4), (7), (14). In consideration of these enhancement factors, the State argued that maximum sentences were warranted for each of the Defendant's convictions. The State also argued that consecutive sentencing was warranted, as two of the Defendant's convictions involved sexual abuse of a minor. Tenn. Code Ann. § 40-35-115(b)(5).

---

[4] While the parties did not specify the particular grounds for this "notice issue," we surmise from our review of the record that it related to the State's failure to file a written notice identifying the specific acts of sexual abuse upon which it intended to rely upon in its prosecution of the charge of continuous sexual abuse. See Tenn. Code Ann. § 39-13-518(d) (requiring the State, at least thirty days before a trial on a charge of continuous sexual abuse of a child, to "file with the court a written notice identifying the multiple acts of sexual abuse of a child upon which the violation of this section is based," including "the identity of the victim and the statutory offense violated.").

The Defendant requested that the trial court consider his completion of a recovery program to treat his drug addiction and his subsequent employment as a counselor at a rehabilitation facility to mitigate his sentences. The Defendant argued that he had been deprived of the opportunity to truly cross-examine the victim regarding her allegations because the victim testified her memory was "fuzzy." The Defendant contended that the circumstances of his case did not warrant either maximum sentences or consecutive sentencing.

Following arguments, the trial court concluded that no mitigating factors applied to reduce the Defendant's sentence. The trial court declined to apply enhancement factors four and seven to increase the Defendant's sentence, concluding that both the victim's vulnerability due to her age and the Defendant's performance of the offenses in pursuit of a desire for pleasure or excitement were both "encompassed" by the elements of his convictions. The trial court also found the Defendant's criminal record to be "slim" and noted that it placed "minimal emphasis" on enhancement factor one. However, the trial court concluded that enhancement factor fourteen applied, finding that the Defendant greatly abused a position of trust as the victim's father. Accordingly, the trial court imposed maximum sentences for each of the Defendant's convictions. The trial court aligned the Defendant's conviction of incest to run concurrently to his conviction of aggravated sexual battery. Because the Defendant had been convicted of three offenses involving a minor victim and because the Defendant was the victim's father, the trial court concluded that consecutive sentencing was appropriate. The trial court thus aligned the Defendant's conviction of aggravated sexual battery consecutively to his conviction of rape of a child, yielding an effective sentence of fifty-two years' incarceration.

The Defendant filed a timely but unsuccessful motion for new trial. This timely appeal followed.

## II. Analysis

On appeal, the Defendant argues that (1) the trial court erred in denying his motion to suppress his confession, (2) the trial court erred in admitting a recording of the victim's forensic interview, (3) the evidence adduced at trial was insufficient to sustain his convictions, (4) the State's elections of offenses were insufficient to protect his right to a unanimous jury verdict for his charges of rape of a child and incest, and (5) his sentence is excessive. We will address these issues in turn.

## A. Motion to Suppress

The Defendant first contends that the trial court erred by denying his pretrial motion to suppress the recording of his October 30, 2020, interview with Detectives Webb and Ramsey, in which he confessed to performing oral sex on the victim and to touching her vagina and breasts. The trial court held a hearing on the Defendant's motion to suppress on October 26, 2021.[5]

At the evidentiary hearing, Detective Webb testified that he and Detective Ramsey interviewed the Defendant at the Cocke County courthouse on October 30, 2020, for approximately two hours. Detective Webb wrote a summary of the Defendant's confession, which the Defendant signed at the conclusion of the interview. Detective Webb testified that this summary was not a transcript of the interview and agreed that he omitted details not directly related to the Defendant's confession. He described the tone of the interview as "cordial" and stated there was "no hostility," "shouting[,] or yelling." He further denied threatening the Defendant at any point in the interview.

Detective Webb recalled that the Defendant was provided with cigarettes and a Sprite upon his request and that he was permitted to smoke during a break in the interview. Detective Webb testified he made no promises or guarantees of leniency in exchange for the Defendant's cooperation, though he acknowledged he told the Defendant he would speak to the district attorney's office if he was cooperative and remorseful. Detective Webb stated he wore plain clothes during the interview and was "probably not" armed. He noted that he recorded the interview on a "key fob recorder" which automatically stopped recording near the end of the interview because it ran out of storage. He estimated that approximately thirty-five minutes of the interview were inadvertently omitted from the recording.

On cross-examination, Detective Webb agreed that he lied to the Defendant by insinuating that the police had recovered evidence of the Defendant's semen from the victim's clothing, noting that he had not yet received the results of the TBI's examination of the victim's clothing at the time of the interview. He recalled that he repeatedly asked the Defendant to "tell the truth" and that the Defendant repeatedly denied having sexual intercourse with the victim.

Detective Ramsey denied threatening, promising, or guaranteeing anything to the Defendant during his interview. However, he recalled telling the Defendant he would

---

[5] The record does not include a copy of the Defendant's motion to suppress or any response from the State. However, upon our review of the transcript, we find the basis of the Defendant's motion, the State's arguments in opposition, and the trial court's findings of fact and conclusions of law to be sufficiently documented for appellate review.

speak to the district attorney's office on the Defendant's behalf if he cooperated. Detective Ramsey stated he told the Defendant he could serve "as much as a hundred years" if convicted of the charges against him. He noted that he had not done any calculations as to the appropriate sentencing ranges for the Defendant's charges and averred that he gave the estimate "off the top of my head."

On cross-examination, Detective Ramsey described the interview as initially "slow." He recalled that the Defendant appeared to have "something on his mind that he wanted to talk about," so he pressed the Defendant to "open up" by asking increasingly pointed questions about the victim's allegations. He described the Defendant as more relaxed after he confessed to performing oral sex on the victim. Detective Ramsey also noted that he did not yet know the results of the TBI's examination of the victim's clothing during the interview. Detective Ramsey denied that he attempted to intimidate or coerce the Defendant into confessing.

The trial court bifurcated the suppression hearing to review the recording of the Defendant's confession. When the hearing resumed on November 2, 2021, the Defendant testified that he knew Detective Ramsey from his 2016 arrest for theft and averred that he believed they had developed a "rapport" from that investigation. The Defendant recalled that he denied the victim's allegations for approximately one hour during his interview. However, he felt "scared to death" after Detective Ramsey told him he could face more than one hundred years' incarceration if convicted. The Defendant stated this fear was compounded when Detective Webb noted that a local defendant had recently been convicted of similar charges and received a sentence of sixty years' incarceration. Though the Defendant maintained his innocence, he stated that in "every dealing I've ever had with the law, when it came to [S.M.], no one ever listened to me." The Defendant testified that he gave a false confession and would not have done so if not for the effect of Detectives Webb and Ramsey's "combined statements." He also noted that he was held in confinement for three or four days before his interview.

On cross-examination, the Defendant agreed that he voluntarily signed Detective Webb's summary of his confession. He described the interview as initially cordial but noted that Detective Ramsey's demeanor towards him changed when he told him about his potential sentence. He testified that neither detective ever threatened him with physical harm. Though he further agreed that neither detective made guarantees or promises of lenient punishment, he testified that they implied they would help him if he cooperated. He recalled that he pled with the detectives to help him avoid "spend[ing] the rest of [his] life in prison" and that he believed they would do so if he confessed.

The Defendant stated that he had completed high school and had some college education. He further testified that he was not under the influence of any narcotic or drug

- 13 -

nor deprived of food, sleep, or medical attention during his interview. He noted that he was handcuffed during his interview.

In closing arguments, the State argued that the recording of the Defendant's interview was admissible because the totality of the circumstances indicated that his confession contained therein was voluntary. Specifically, the State noted that the Defendant was questioned over the course of two hours; was permitted to take breaks and provided with a drink and cigarettes upon his request; was not harmed or threatened with physical abuse; was not under the influence of alcohol, drugs, or other narcotics; and was not deprived of food, sleep, or medical attention. Further, the State noted that the Defendant had previously served eight years in the United States Air Force, had some college-level education, and had previous experience with law enforcement. The State contended that Detective Webb's statement regarding the presence of the Defendant's semen on the victim's clothing was phrased as a hypothetical, rather than as an attempt to coerce a confession through deception.

The Defendant argued that his confession should be suppressed because it was false and involuntary. He noted that he repeatedly denied the victim's allegations over the course of an hour and maintained that he would not have confessed but for the "promises[,] threats[,] and deception[] used by the police." The Defendant argued that Detective Webb's insinuation that the Defendant's semen had been found on the victim's clothing, Detective Ramsey's statement that he could receive a sentence of more than one hundred years' incarceration if convicted as charged, and Detective Ramsey's reference to a local defendant recently found guilty of similar charges were intended to frighten and coerce him into confessing. He asserted that he believed the detectives' assurances that they would talk to the district attorney's office on his behalf if he cooperated and confessed.

The trial court denied the Defendant's motion to suppress the recording of his interview, concluding that the totality of the circumstances indicated that his confession was voluntary. The trial court found that the Defendant was "well-spoken" and of "above average intelligence," that he had previous experience with law enforcement stemming from his 2016 theft conviction, and that he was interviewed for a fairly short time prior to his confession. It further noted that the Defendant was not intoxicated, deprived of any necessities, or held in confinement for an overly long period of time prior to his interview. The trial court reasoned that the tone of the interview was cordial, noting that the Defendant was permitted to take a break and was provided with cigarettes and a Sprite upon his request. Additionally, the trial court found that any "deception" employed by Detective Webb in his statement regarding the presence of the Defendant's semen on the victim's clothing did not operate to coerce the Defendant's confession because the "deception used . . . doesn't match up with" the Defendant's ultimate confession that he touched the victim's breasts and vagina and performed oral sex on her.

On appeal, the Defendant maintains that his confession should have been suppressed because it was involuntary and false and made under "undue influence" and "pressure" following the detectives' "repeated lies." He identifies several statements made by Detectives Webb and Ramsey throughout the interview as coercive and posits that their combined effect served to overbear his will. The State responds that the trial court appropriately denied the Defendant's motion to suppress by concluding that his confession was voluntary.

"Questions about the credibility of the witnesses, the weight and value of the evidence," and conflicts in the evidence are resolved by the trial court as the trier of fact in a suppression hearing. State v. Green, 697 S.W.3d 634, 640 (Tenn. 2024) (internal quotation marks omitted) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). On review of a suppression determination, this court is bound by the trial court's findings of fact unless the evidence preponderances against them. Odom, 928 S.W.2d at 23. However, we review the trial court's application of the law to these findings of fact *de novo* with no presumption of correctness. State v. Henry, 539 S.W.3d 223, 232 (Tenn. Crim. App. 2017) (first citing State v. Montgomery, 462 S.W.3d 482, 486 (Tenn. 2015); and then citing State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)).

The Fifth Amendment to the Constitution of the United States provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against self-incrimination is fundamental and applies to the states through the Fourteenth Amendment's Due Process Clause). Similarly, the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. In accordance with these principles, our courts have long held that involuntary confessions are inadmissible at trial. Bram v. United States, 168 U.S. 532, 542-43 (1897); McCravey v. State, 426 S.W.2d 174, 175 (Tenn. 1968). "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996).

To determine whether a defendant's confession was voluntary, this court examines the totality of the circumstances surrounding the confession, including "both the characteristics of the accused and the details of the interrogation." State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013) (citing Dickerson v. United States, 530 U.S. 428-434 (2000)). Factors relevant to this assessment include, but are not limited to:

[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave a confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996) (emphasis omitted) (quoting People v. Cipriano, 429 N.W.2d 781, 790 (1988)).

Importantly, a finding of coercive police activity "is a necessary predicate to finding that a confession is not voluntary." Smith, 933 S.W.2d at 455 (citing State v. Brimmer, 876 S.W.2d 75, 79 (Tenn. 1994)). Thus, the central inquiry in a voluntariness analysis is whether, based on the totality of the circumstances, "the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). A defendant's subjective perception is insufficient to justify a finding of involuntariness. Smith, 933 S.W.2d at 455 (citing Brimmer, 876 S.W.2d at 76). "In order to be considered voluntary, the statement must not be extracted by any sorts of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (internal quotation marks omitted) (quoting Bram, 168 U.S. at 542-43). That said, promises of leniency from law enforcement do not render a confession *per se* involuntary. Smith, 933 S.W.3d at 455.

In this case, the Defendant argues that Detectives Webb and Ramsey employed coercive tactics during his interview which were intended to, and indeed did, overbear his will and elicit an involuntary confession. He articulates this argument by identifying several statements the detectives made throughout his interview. As a preliminary matter, we note that the Defendant does not challenge on appeal the trial court's findings of fact and conclusions of law as they relate to the remainder of the totality of the circumstances surrounding his interview. Nevertheless, we note that the Defendant testified that he had some college-level education, that he previously served in the United States Air Force, and that he had previous experience with law enforcement and believed that he had developed a "rapport" with Detective Ramsey following a previous arrest. Further, at no point during the Defendant's interview was he denied food, drink, medical attention, sleep, or any other necessity, and was in fact permitted to take a break in which he smoked cigarettes and

- 16 -

drank a Sprite which the detectives provided for him. The Defendant was also not under the influence of any intoxicant during the interview. Neither detective threatened the Defendant with physical harm nor raised their voices at him. Additionally, the interview was not overly lengthy, and the Defendant was not confined for an unnecessarily long period prior to his interview. The record therefore does not preponderate against the trial court's findings of fact.

The Defendant nevertheless argues that his confession was involuntary and was elicited through "undue influence, pressure, and repeated lies." He first contends that Detective Webb lied to him during his interview by stating, "I'm going to tip our hand a little bit more . . . we've recovered a bunch of clothes from [the victim] . . . what would you do if I told you that your semen was found on about two of those pieces of clothing?" Though the State responds that this statement was phrased as a hypothetical, the Defendant maintains that he understood it as an assertion of fact and that it its effect "was a gut punch" and "like a bag of bricks dropping on his head." The Defendant argues that he concocted a false confession because he truly believed that the detectives had irrefutable DNA evidence substantiating the victim's allegations which would be introduced against him at a future trial.

We need not resolve the parties' semantic disagreement as to whether Detective Webb's statement is properly considered a lie or a hypothetical because regardless, a police officer's misrepresentations, while certainly relevant to our voluntariness analysis, do not in and of themselves render a confession involuntary. State v. Stearns, 620 S.W.2d 92, 96 (Tenn. 1981) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)). As the trial court noted, the Defendant ultimately confessed to performing oral sex on the victim and to touching her breasts and vagina, which failed to explain the presence (or lack thereof) of his semen on her clothing. Instead, the Defendant theorized that his semen arrived on the victim's clothing via transferal from a used bathroom towel which he discarded into the victim's laundry hamper after masturbating. Like the trial court, we find it difficult to agree that the Defendant felt coerced by a statement which purported to link his DNA to the victim's clothing into giving a confession which failed to explain how his DNA arrived there. Inasmuch as Detective Webb's statement exaggerated the proof against the Defendant, panels of this court have previously held that such exaggerations do not render a defendant's confession involuntary. See, e.g., State v. Mayes, No. E2022-00824-CCA-R3-CD, 2023 WL 7049419, at *11 (Tenn. Crim. App. Oct. 26, 2023), perm. app. denied (Tenn. May 16, 2024) (concluding that an officer's exaggerations about the accuracy of GPS data from the defendant's ankle monitor and misrepresentations regarding an analysis of surveillance footage of the crime scene were insufficient to render the defendant's statement involuntary); State v. Hardy, No. M2008-00381-CCA-R3-CD, 2009 WL 2733821, at *9 (Tenn. Crim. App. Aug. 31, 2009) (concluding that an officer's misrepresentation about being able to affix a particular date to evidence recovered from the

- 17 -

defendant's vehicle was insufficient to render the defendant's statement involuntary); State v. Green, No. 01C0A-9510-CC-00351, 1996 WL 741551, at *4 (Tenn. Crim. App. Dec. 30, 1996) (concluding that an officer's statement that the defendant's fingerprints had been discovered on a dollar bill left at the crime scene was insufficient to render the defendant's confession involuntary, despite the fact that "the dollar bill was still undergoing a fingerprint test").

The Defendant also identifies as coercive Detective Ramsey's estimation that the Defendant could face a sentence of more than one hundred years' incarceration if convicted as charged. During his interview, the Defendant asked how long he could expect to be sentenced if convicted of the charges against him, to which Detective Ramsey responded that he could receive a sentence of "a hundred years or more," "if you round everything on the minimum," but advised that the Defendant might not be ultimately convicted as charged. Though this response was likely intimidating, it was also both truthful and given upon the Defendant's request. The Defendant was charged in a nine-count sealed presentment on October 14, 2020, with three counts of incest, two counts of rape, and one count each of aggravated assault, aggravated sexual battery, rape of a child, and continuous sexual abuse of a child. If the Defendant was convicted as charged, and assuming that he was classified as the lowest eligible Range offender and received the minimum sentence possible for each conviction, he was eligible for three twelve-year sentences for incest, two twelve-year sentences for rape, a three-year sentence for aggravated assault, an eight-year sentence for aggravated sexual battery, a twenty-five year sentence for rape of a child, and an eight-year sentence for continuous sexual abuse of a child. See Tenn. Code Ann. §§ 39-15-302 (2020), -13-503 (2018), -102 (2018), -504 (2017), -522 (2020), 40-35-112. Thus, the Defendant was plainly facing a lengthy sentence if convicted as charged, especially if his convictions were aligned consecutively. "[T]ruthful statements about [a defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." Smith, 933 S.W.2d at 456 (internal quotation marks omitted) (quoting United States v. Pelton, 835 F.2d 1067, 1072-73 (4th Cir. 1987)); see also State v. Eddie, No. W2011-00966-CCA-R3-CD, 2012 WL 2307022, at *12 (Tenn. Crim. App. June 18, 2012) (holding that an officer's equivocal statement to the defendant that he could face a lengthy sentence was not coercive where the defendant was charged with first degree murder).

Relatedly, the Defendant contends that he was coerced into confessing by the detectives' continued requests for him to tell the truth. He maintains that proof of the pressure he felt may be found in his asking the detectives whether his charges could be reduced to "something less" and his requests for help to avoid spending the rest of his life in prison. He notes that though he maintained his innocence for nearly an hour, the detectives told him repeatedly that they were unable to help him "unless he got honest with them." These statements do not amount to promises of leniency which could plausibly compel the Defendant's subsequent confession. See Kelly, 603 S.W.2d at 728 (holding

- 18 -

that the Fifth Amendment "condemns only those [confessions] which are compelled by promises of leniency.") (quoting Hunter v. Swenson, 372 F. Supp. 287, 300 (W.D. Mo. 1974)). At no point was the Defendant threatened with a greater punishment if he refused to cooperate with law enforcement. Although the detectives noted that they would speak to the district attorney's office on his behalf if he was cooperative during the interview, they did not promise or guarantee any reduced sentence in exchange for such cooperation. Further, we conclude that any offers of help the detectives made were equivocations intended to prompt the Defendant to be truthful, and as such were not coercive. See State v. McRee, No. W2013-00194-CCA-R3-CD, 2014 WL 168606, at *9 (Tenn. Crim. App. Mar. 21, 2014) (finding the defendant's confession voluntary despite equivocal statements from the interviewing detectives that the defendant's confession could lead to leniency in the prosecution of his case).

We conclude that none of the detectives' statements during the Defendant's interview rendered his statement involuntary; accordingly, we cannot agree with the Defendant's contention that their combined effect served to overbear his will. The totality of the circumstances in this case indicates that the Defendant was interviewed in a cordial setting and gave a voluntary confession following approximately one hour's worth of questioning. The trial court did not err in denying the Defendant's motion to suppress his confession, and the Defendant is not entitled to relief on appeal on this claim.

### B. Admission of the Victim's Forensic Interview

The Defendant also argues that the trial court erred in admitting the recording of the victim's forensic interview. Prior to trial, the State filed a motion to admit the recording, and the trial court held a hearing thereupon pursuant to Tennessee Code Annotated section 24-7-123(b)(2) on July 5, 2022.[6]

At the pretrial evidentiary hearing, the victim testified that she was interviewed at Safe Harbor in July 2020 regarding her allegations against the Defendant. The recording of her forensic interview was played, and the victim identified herself and Ms. Stith in the video. She testified that the recording was a true and accurate representation of what she said during her interview and averred that she did not feel pressured to say anything during the interview. She maintained that her allegations against the Defendant were true.

Jennie Stith testified that she was a semi-retired forensic interviewer. She estimated she had performed more than 3,000 forensic interviews during her nearly thirteen years of

---

[6] As with the Defendant's motion to suppress, the record does not contain a copy of the State's motion to admit the recording or any response from the Defendant. However, upon our review of the transcript, we find the basis of the State's motion, the Defendant's arguments in opposition, and the trial court's findings of fact and conclusions of law to be sufficiently documented for appellate review.

employment at Safe Harbor. Ms. Stith stated that she used a system of three cameras and three microphones placed throughout the interview room to record her questions and the interviewee's responses. She described Safe Harbor as a nonprofit organization, identified its executive director, and noted that it had a memorandum of understanding with law enforcement. She stated that representatives from Safe Harbor met monthly with a child protective intervention team and that the facility contained an office for a representative from the Department of Children's Services. She also noted that she maintained a file for each child she interviewed, which she kept in a safe along with the recordings of their interviews. A copy of Ms. Stith's curriculum vitae was entered into evidence. Ms. Stith agreed that the recording was a true and accurate representation of the victim's forensic interview.

The State argued that it had satisfied its burden of proving the recording's admissibility pursuant to Tennessee Code Annotated section 24-7-123. As relevant to this appeal, the Defendant argued that admitting the recording would permit the State to present the victim's unsworn testimony to the jury. The Defendant asserted that the recording's admission would violate the Confrontation Clause and would impermissibly shift the burden of proof to the defense by requiring the Defendant to disprove the claims the victim presented.

The trial court admitted the recording, finding that the victim was under the age of thirteen when the interview took place, that she testified the recording was a true and accurate depiction of her statements during the interview, and that the victim would be present and available for cross-examination at trial. The trial court further concluded that the recording was sufficiently trustworthy, that it satisfied the requirements of Code section 24-7-123(b), and that its admission would not violate the Confrontation Clause because the victim would be statutorily required to be present at the trial to both authenticate the recording and be subject to cross-examination.

At trial, the Defendant reiterated his previous objections to the recording's admissibility, which the trial court overruled. The State presented the recording through the victim's testimony. On direct examination, the victim identified herself and Ms. Stith in the recording and testified that everything she said during the interview was true. On cross-examination, the victim clarified that the Defendant's most recent visit to her home was during the weekend of July 4, 2020. She twice testified that she was unsure whether the rape in S.M.'s bedroom or the rape at the new house was the last time she was raped, and counsel for the Defendant twice asked whether she had lied during the interview. Counsel for the Defendant then requested a jury-out hearing to discuss the recording's admissibility.

During the jury-out hearing, the Defendant moved for a mistrial, arguing that the victim had both contradicted herself and admitted she had lied during the interview. The trial court denied the Defendant's motion for a mistrial, and the Defendant subsequently moved to exclude the recording from evidence, arguing it could not be truthful in light of the victim's contradictory statements. The trial court denied the Defendant's motion, concluding that "this is all a question for the trier of fact."

On appeal, the Defendant reiterates his argument that admitting the recording violated his right to confront the victim. He asserts that although the victim testified that the recording was a true and correct representation of what she said during her forensic interview, she nevertheless "refused" to answer questions on cross-examination regarding the details of her allegations. The Defendant posits that this refusal rendered the victim functionally unavailable for cross-examination. He also argues that the trial court abused its discretion in admitting the recording because the victim's contradictory statements rendered the recording untrustworthy for the purposes of Tennessee Code Annotated section 24-7-123(b). He further contends that the trial court applied an incorrect standard of law in denying his motion to exclude the recording because it concluded the question of the victim's credibility was "a question for the trier of fact." We will address these issues in turn.

### 1. Confrontation Clause

Generally, this court reviews evidentiary issues under an abuse of discretion standard. State v. McCoy, 459 S.W.3d 1, 8 (Tenn. 2014). However, when an evidentiary issue presents a question of law involving statutory or constitutional interpretation, this court reviews it *de novo* with no presumption of correctness. Id.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; see also Pointer v. Texas, 380 U.S. 400, 403 (1965) (holding that a criminal defendant's right to confrontation under the Sixth Amendment is fundamental and is applicable to the states via the Fourteenth Amendment). Similarly, the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . [and] to meet the witnesses face to face." Tenn. Const. art. I, § 9. The same constitutional analysis applies to Confrontation Clause claims raised under either the United States Constitution or the Tennessee Constitution. State v. Hutchison, 482 S.W.3d 893, 905 (Tenn. 2016).

The Confrontation Clause thus guarantees the criminal defendant the right to both physically face witnesses and the right to cross-examine witnesses at trial. State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). Because "the principal evil at which the

Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," Crawford v. Washington, 541 U.S. 36, 50 (2004), the Confrontation Clause prohibits the admission of out-of-court testimonial statements "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination," State v. Dotson, 450 S.W.3d 1, 63 (Tenn. 2014) (citing Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009)). Therefore, the central inquiry in a Confrontation Clause analysis is whether the challenged statement is testimonial in nature. Dotson, 450 S.W.3d at 63. A statement is testimonial when its primary purpose is to "establish or prove past events potentially relevant to later criminal prosecution." Id. at 64 (citing Davis v. Washington, 547 U.S. 813, 822 (2006). A statement's primary purpose is determined by looking to "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. at 64.

Statements made by a child in a forensic interview conducted pursuant to Tennessee Code Annotated section 24-7-123 are testimonial in nature. McCoy, 459 S.W.3d at 15. Accordingly, when the State seeks to introduce a video recording of a child's forensic interview, the child must testify to authenticate the video recording and be subject to cross-examination at trial. Id. at 16; see also Tenn. Code Ann. § 24-7-123(b)(1).

The Defendant maintains that the victim's "refusal" to answer his questions regarding the details of her allegations rendered her functionally unavailable for cross-examination. This contention is not supported by the record or the law. The Defendant's cross-examination spanned more than fifteen pages of transcript and largely focused on the victim's allegations during her forensic interview. The victim responded to these questions, recalling that the Defendant began sexually touching her when she was in kindergarten or first grade; that the Defendant later began forcing her to perform oral sex on him; that the Defendant showed her pornographic videos; that the Defendant worked on "the other side of the state" and that she last saw him prior to trial during his visit over the weekend of July 4, 2020; that she told S.M. that the Defendant raped her; and that she subsequently told Ms. Stith of her allegations in a forensic interview. The victim only testified she was unable to recall whether the Defendant discussed her hygiene with her during his most recent visit and whether the last time the Defendant raped her was in S.M.'s bedroom or at the new house. She also stated she did not lie during her forensic interview and that everything she stated therein was truthful. These responses can hardly be characterized as "refusals" to answer the Defendant's questions.

The Defendant nevertheless relies upon this court's holding in State v. Franklin, 585 S.W.3d 431, 455 (Tenn. Crim. App. 2019), in support of his claim that he was deprived of the right to confront the victim through cross-examination. The defendant in Franklin posited that he was "denied his right to confront the victim due to her age and unwillingness

to discuss the details of the alleged incident at trial" following the introduction of her forensic interview. Id. Notwithstanding the defendant's waiver of the issue, the Franklin court found the Defendant was provided the opportunity to cross-examine the victim and took ample advantage of that opportunity by asking her 123 questions, which the victim answered. Id. Although the court noted that the victim was unable to recall certain details in her responses to the defendant's questioning, it concluded that the defendant was presented "the opportunity to bring out such matters as the witness' bias . . . lack of care and attentiveness, . . . poor eyesight, and even (what is often a prime objective of cross-examination) . . . the very fact that [she] has a bad memory." Id. (internal quotation marks omitted) (citing United States v. Owens, 484 U.S. 554, 558 (1988)).

Thus, while factually similar to the issue *sub judice*, our holding in Franklin is inapposite to the Defendant's argument.[7] We disagree with the Defendant's contention that the victim "failed to answer almost every question defense counsel asked her in relation to the elements of the crime"; the victim was simply unable to recall certain answers to the Defendant's questions. A witness's "lack of memory does not render [her] unavailable for purposes of the [C]onfrontation [C]lause." State v. Ackerman, 397 S.W.3d 617, 641 (Tenn. Crim. App. 2012), overruled on other grounds by State v. Sanders, 452 S.W.3d 300, 315 (Tenn. 2014). The Defendant's opportunity to cross-examine the victim was unfettered, and as in Franklin, he took ample advantage of that opportunity by presenting the inconsistencies in the victim's account to the jury. See State v. McMillan, No. E2020-00610-CCA-R3-CD, 2022 WL 855262, at *13 (Tenn. Crim. App. Mar. 23, 2023) (finding no Confrontation Clause violation despite the victim's inability to recall certain details of her allegations because she "was available to testify and, in fact, testified at trial, subject to cross-examination" and the defendant's "opportunity to question the victim was unfettered"); see also State v. Eddins, No. M2006-02315-CCA-R3-CD, 2007 WL 4116490, at *5 (Tenn. Crim. App. Nov. 14, 2007) (noting that questioning the validity of a witness's claims "is a valid, and indeed the most essential, purpose of cross-examination"). This satisfies the Confrontation Clause, and the victim's inability to recall certain details of her allegations on cross-examination does not negate that fact. The Defendant is not entitled to relief on this claim.

## 2. Abuse of Discretion

The Defendant next argues that the trial court abused its discretion in denying his trial motion to exclude the recording of the victim's forensic interview. Although he does not argue that the trial court erred in its conclusion at the pretrial evidentiary hearing that

---

[7] Because the Franklin court concluded that the defendant had waived his Confrontation Clause claims, its analysis of those claims notwithstanding waiver is dicta. Nevertheless, we find the court's reasoning persuasive and adopt it herein.

- 23 -

the video was trustworthy pursuant to Tennessee Code Annotated section 24-7-123(b), he nevertheless contends that the victim's "refusal" to testify whether she was last raped in S.M.'s bedroom or at the new house or whether she lied during her forensic interview negates the trial court's finding of trustworthiness. He also argues that the trial court applied an incorrect legal standard in denying his motion to exclude the recording by concluding the victim's credibility was a question of fact.

A trial court's decision to admit a child's forensic interview is reviewed for an abuse of discretion. Franklin, 585 S.W.3d at 448. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical or unreasonable decision, or bases its decision on a clearly erroneous assessment of the evidence. McCoy, 459 S.W.3d at 8 (citing State v. Mangrum, 403 S.W.3d 152, 166 (Tenn. 2013)).

As relevant to this appeal, when the State seeks to admit a video recording of a forensic interview made by a child younger than thirteen years old, the trial court must hold a pretrial evidentiary hearing to determine whether, "to the reasonable satisfaction of the court," the recording possesses particularized guarantees of trustworthiness. Tenn. Code Ann. § 24-7-123(b)(2). In its analysis, the trial court must consider:

(A) The mental and physical age and maturity of the child;
(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
(C) The timing of the child's statement;
(D) The nature and duration of the alleged abuse;
(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
(F) Whether the statement is spontaneous or directly responsive to questions;
(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;
(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;
(I) The relationship of the child to the offender;
(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and
(K) Any other fact deemed appropriate by the court[.]

Id. The child or the forensic interviewer who conducted the interview must also testify under oath "that the offered video recording is a true and correct recording of the events contained in the video." Tenn. Code Ann. § 24-7-123(b)(1). The child must also be available for cross-examination.

- 24 -

After reviewing the recording of the victim's forensic interview and hearing arguments from both parties at the pretrial evidentiary hearing, the trial court concluded that the recording was admissible pursuant to Tennessee Code Annotated section 24-7-123(b). In doing so, the trial court concluded that the victim was ten years old when she made the statements contained in the forensic interview; that she testified at the pretrial evidentiary hearing that the recording was a true and correct recording of her forensic interview; and that she would be available for cross-examination. The trial court then made specific findings regarding the statutorily required guarantees of trustworthiness:

> The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pretrial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors: (A) the mental and physical age and maturity of the child.
>
> The child was just nearly so old that they wouldn't qualify for this statute['s] protection. She's ten, and I found her to be very articulate and communicated very well. She struggled some, but who wouldn't struggle talking about the event that she claimed to have happened if they indeed happened. And regardless, though, she communicated. She communicated her allegations well.
>
> Any apparent motive. No motive has been shown nor testified to that she might falsify or distort anything.
>
> The timing of the child's statement. It's my understanding that that statement was taken fairly recently in time after she had alerted authorities of the allegations.
>
> It says the nature and duration of the alleged abuse. It's her testimony that it was ongoing for a number of years right up until right before the interview was taken, because she stated at the time she was ten, and then she was ten whenever the last incident had taken place.
>
> (E) Whether a child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience. Like I said, she's an older child as far as this statute is concerned. She's ten. You can't use it for one over thirteen. Nevertheless, I have to disagree with [defense counsel] – and it's his job to say she was not clear – I thought she was fairly clear and fairly articulate

-25-

about some of the things, the allegations she made, and graphic and detailed as the statute says.

Part (F). I thought she was directly responsive to the questions. . . . I know that we as lawyers were taught about leading questions, and you can ask leading questions without them being front-ended, but I didn't even see that many to – she's searching for information to talk about a goal here. But she left them open-ended. This child could have said no, I don't. You know, it was a choice. She was asking her what time it was instead of telling her, "It was five o'clock, wasn't it," basically is my point. So I don't find that there were leading questions involved in this interview.

Part (H). Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement. We've dealt with all kinds of evidence in this case thus far. Not so much today in this hearing, but these are just factors, and I'm going to find that one also goes in the State's favor.

The relationship of the child to the offender. . . . I'll address that the relationship is a biological father. That's what the child testified to. I'll leave it at that.

Whether the equipment that was used to make the video recording was capable of making an accurate recording. I understood it very well, so there's that.

The trial court then concluded that the remainder of the factors required by Tennessee Code Annotated section 24-7-123(b)(3)-(6) were satisfied and admitted the recording.

The Defendant does not appear to challenge the trial court's pretrial conclusions regarding the recording's satisfaction of the statutorily required guarantees of trustworthiness, and our review of the record indicates that the trial court properly considered the evidence received at the hearing, as well as the parties' arguments, and made specific findings which were supported by the record in admitting the recording. Accordingly, we discern no abuse of discretion in its admission of the recording.

Nevertheless, the Defendant maintains that the recording should have been stricken following his objection that "there was now[] no longer a finding of 'trustworthiness' because [the victim] had to have lied . . . [and] because all these statements in the video cannot be true[.]" Inasmuch as the Defendant intends to claim that the victim's contradictory statements in her forensic interview, coupled with her "refus[al] to testify as

to which location was the last time and exactly when did she lie" during her forensic interview during cross-examination, somehow overrode the trial court's pretrial determination that the recording possessed the statutorily required guarantees of trustworthiness, we disagree. The Defendant cites to no law, and we are aware of none, which stands for his proposition. Further, we do not discern any point in the transcript where the trial court rescinded its pretrial findings of trustworthiness to support the Defendant's argument that there was "no longer a finding of trustworthiness," nor do we find anything to suggest that the recording as a whole was untrustworthy.

The substance of the Defendant's argument targets the credibility of the victim's statements in her forensic interview and her testimony at trial. He raised these issues during the jury-out hearing to discuss the recording's admissibility, moving to strike the recording because victim's inconsistent statements and the gaps in her memory indicated her allegations "can't be truthful." The trial court denied this objection, concluding

> I'm not disqualifying the video. She stated under [direct-examination] that she did remember. Like I said, you're doing your job. You got an answer or two there that has led to this jury-out. And I don't blame you. But I feel this is all a question for the trier of fact. So she had stated on direct she remembered this to be as it was, and that everything she said there was truthful. You've done a good job since then. But she said that originally on direct. Denied.

As the trial court correctly noted, the question of a witness's credibility is an issue of fact that the jury must resolve, not the trial court. See State v. McKinney, 669 S.W.3d 753, 773 (Tenn. 2023); see also State v. Lovin, No. E2021-00705-CCA-R3-CD, 2022 WL 3078579 (Tenn. Crim. App. Aug. 3, 2022) (holding that though the victim's statements in her forensic interview "lacked clarity, there was nothing to suggest that the interview as a whole was not trustworthy, and the trial court properly concluded that the jury, in its determination of credibility, could take into account any lack of clarity in the victim's individual statements."). Therefore, we find no abuse of discretion either in the trial court's decision to admit the recording or in its denial of the Defendant's motion to exclude the recording at trial. The Defendant is not entitled to relief on this claim.

## C. Sufficiency

The Defendant also challenges the sufficiency of the convicting evidence for each of his convictions. He maintains that the recording of the victim's forensic interview should have been excluded and that without this proof, there is no proof to support his conviction of aggravated sexual battery and "little to no proof" to support his convictions

of rape of a child and incest.[8] The State responds that the evidence adduced at trial was sufficient to sustain each conviction.

The standard of appellate review for a defendant's challenge to the sufficiency of the convicting evidence is deferential to the jury's verdict. State v. Lyons, 669 S.W.3d 775, 791 (Tenn. 2023). This court reviews such challenges in the light most favorable to the State and if, after drawing all reasonable inferences from the evidence adduced at trial in the State's favor, it appears that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," sufficient evidence exists to support the jury's verdict. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts [in the evidence] in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Thus, in reviewing the sufficiency of the evidence, this court does not reweigh the evidence or substitute its own inferences for those drawn by the trier of fact, Dorantes, 331 S.W.3d at 379, as the jury's verdict of guilty resolves "questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence," McKinney, 669 S.W.3d at 773 (citing State v. Majors, 318 S.W.3d 850, 867 (Tenn. 2010)). The defendant bears the burden of proving the insufficiency of the convicting evidence on appeal. State v. Thomas, 687 S.W.3d 223, 249 (Tenn. 2024) (citing State v. Chambers, 35 S.W.3d 516, 557-58 (Tenn. 2000)).

As relevant to this appeal, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant . . . [and] the victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). Sexual contact is the intentional touching of "the victim's, the defendant's, or any other person's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

The sum of the Defendant's challenge to this conviction is that the evidence is insufficient to sustain it without the recording of the victim's forensic interview, which he maintains was inadmissible. However, when reviewing the sufficiency of the convicting evidence, this court considers all the evidence presented at trial, regardless of whether it was properly admitted. State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981); see also State v. Murray, No. M2021-00688-CCA-R3-CD, 2022 WL 17336522, at *5 (Tenn. Crim. App. Nov. 30, 2022) ("[E]ven if we concluded that the [evidence] should not have been admitted, [it was] admitted at trial, and [its] inclusion into the sufficiency of the evidence

---

[8] We address the Defendant's challenge to the sufficiency of the convicting evidence in the context of his challenge to the State's election of offenses below.

calculus is not affected by whether this evidence should have been inadmissible."). Thus, the Defendant's argument as it relates to this conviction is unavailing.

Notwithstanding the Defendant's failure to otherwise argue that the State failed to prove any essential element of the charge of aggravated sexual battery, we note that the evidence was sufficient to sustain the conviction. The indictment in this case charged the Defendant with aggravated sexual battery occurring "on or about a day in 2017." In her July 19, 2020, forensic interview, the victim stated that she was presently ten years old and in the fourth grade, and that the Defendant first began forcing her to touch his penis when she was in kindergarten or first grade, approximately three years prior. This proof is sufficient to sustain the jury's verdict, and the Defendant is not entitled to relief on this claim.

### D. Election of Offenses

The Defendant also challenges the sufficiency of the convicting evidence for his convictions of rape of a child and incest. He reiterates that the recording of the victim's forensic interview should have been excluded and that without this recording, there is "little to no proof" to support these convictions. He also notes that the victim described two separate rapes as the last time she was raped during her forensic interview and that she was unable to recall which instance was the last time during cross-examination in support of his argument that the evidence is insufficient because "[t]here cannot be two different last times at two different locations[.]"

Within the Defendant's latter claim, we perceived a related challenge: whether the State's election of offenses was sufficient to protect the Defendant's constitutional right to a unanimous jury verdict on the charges of rape of a child and incest. Although not raised by the parties, this issue is related to our consideration of the sufficiency of the convicting evidence. This court has discretion "to consider unpresented or unpreserved issues in certain exceptional circumstances," including "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." State v. Bristol, 654 S.W.3d 917, 926-27 (Tenn. 2022) (citing Tenn. R. App. P. 13(b)). The Rules of Appellate Procedure also provide that this court "shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires." Tenn. R. App. P. 36(a). However, this court "must give the parties fair notice and an opportunity to be heard on the dispositive issues" when it considers an issue not properly presented. Bristol, 654 S.W.3d at 927 (quoting State v. Harbison, 539 S.W.3d 149, 165 (Tenn. 2018)). This requirement is typically satisfied through supplemental briefing. Bristol, 654 S.W.3d at 928. Accordingly, we ordered supplemental briefing to address this issue to help inform our review of the Defendant's challenges to his convictions of rape of a child and incest.

- 29 -

In supplemental briefing, the Defendant asserts that the State failed to elect any offense in its prosecution on the charges of rape of a child and incest. The State responds by questioning whether an election of offenses was required but nevertheless asserting that it made a proper election by specifying that the rape occurred in "July of 2020" during its closing arguments.

Though the Defendant objected to the State's election of offenses at trial, he did not raise the issue in his motion for new trial, nor did he present it to this court prior to our order for supplemental briefing. Consequently, our review is limited to plain error review. Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); see also State v. Knowles, 470 S.W.3d 416, 424 (Tenn. 2015) ("Because the election requirement safeguards a criminal defendant's fundamental, constitutional right to a unanimous jury verdict, errors pertaining to the sufficiency of the prosecution's election are subject to plain error review.") Under plain error review, relief will only be granted when all five of the following prerequisites are met:

> (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

State v. Rimmer, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016). If any one of these factors is not satisfied, this court need not consider the remaining factors. State v. Smith, 492 S.W.3d 224, 232 (Tenn. 2016). The defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007). Additionally, the plain error must have been of such magnitude that it probably changed the outcome of the trial. Smith, 492 S.W.3d at 232 (citing State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)).

The record in this case includes the recording of the victim's forensic interview as well as the transcript of the trial, which includes the parties' closing arguments. The first element of plain error review is therefore satisfied, and we will proceed to consider whether a clear and unequivocal rule of law was breached. Smith, 492 S.W.3d at 232.

The Tennessee Constitution provides that criminal defendants have a fundamental right to a unanimous jury verdict on the charges against them. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994) (citing Tenn. Const. art. I, § 6); see also State v. Shelton,

851 S.W.2d 134, 137 (Tenn. 1993) ("Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution."). This guarantee is usually satisfied due to the "general rule that evidence the defendant has committed some other crime wholly independent of that for which he is charged, even though it is a crime of the same character[,] is generally excluded as irrelevant." State v. Qualls, 482 S.W.3d 1, 9 (Tenn. 2016) (internal quotation marks omitted) (citing Rickman, 876 S.W.2d at 827; Tenn. R. Evid. 404(a), (b)). However, when the State presents "proof of multiple instances of conduct that each match the allegations contained in a single charged count, the State, at the close of its case-in-chief, must elect the distinct conduct about which the jury is to deliberate in returning its verdict on the relevant count." Smith, 492 S.W.3d at 232-33 (collecting cases).

Election issues often arise in the context of prosecutions for sexual crimes committed against children, particularly when the defendant is charged with committing the offenses over a long period of time and the young victim is "unable to identify the exact date on which any one act was perpetrated." State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001) (collecting cases). In cases where an indictment charges that such crimes occurred in a "general time frame[] that encompass[es] several months[,]" "the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." Id. (citing Rickman, 876 S.W.2d at 829); see also Shelton, 851 S.W.2d at 137 ("A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a patchwork verdict based on different offenses in evidence.") (internal quotation marks omitted) (citing State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991)).

The State may elect an offense in a variety of ways, such as by eliciting testimony from the victim which narrows the offense to a specific month, identifies a particular type of offense, or else associates the date of the offense to a meaningful or specific event in the victim's life. Qualls, 482 S.W.3d at 10-11 (citing State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); Shelton, 851 S.W.2d at 138; State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015); State v. Brown, 992 S.W.2d 389, 392 (Tenn. 1991); Tidwell v. State, 922 S.W.2d 497, 499 (Tenn. 1996)). When the State presents this specific evidence of "distinguishable criminal acts," then it "must elect the specific act for which it seeks conviction in a manner that identifies the prosecuted offense for the jury." Qualls, 482 S.W.3d at 16 (citing Shelton, 851 S.W.2d at 138). However, in cases involving generic evidence, such as when a victim describes multiple instances of similar acts of abuse occurring over a long period of time but is unable to differentiate the offenses or otherwise relate them to a specific date

or life event, the criminal defendant's right to a unanimous jury verdict is protected via the trial court's providing a modified unanimity instruction.[9] Qualls, 482 S.W.3d at 17.

In her forensic interview, the victim presented both generic and specific evidence of her abuse. She testified generally that the Defendant would touch her breasts and digitally penetrate her vagina, noting that his fingernails "would scratch in[side] me"; that the Defendant would force her to touch his penis and perform oral sex on him; and that these encounters occurred every one or two weeks, usually when S.M. was away from home or in the bathroom. She stated the abuse began when she was in kindergarten or first grade and continued until the Defendant's most recent visit. The victim also recalled several specific instances in which the Defendant sexually touched her. For example, she stated the Defendant first inappropriately touched her when she was in kindergarten or first grade and that he forced her to touch his penis under the covers, the incident giving rise to the Defendant's conviction for aggravated sexual battery.

During the victim's forensic interview, Ms. Stith asked the victim whether she could recall the last time the Defendant sexually abused her. The victim responded that it occurred "the last time he came to visit." Though she did not know precisely when this visit occurred, she stated that she was ten years old and that it was "like last month," though she noted she did not "really check the months." She noted that the Defendant was "staying the weekend" during this visit and that it only happened "one time that weekend." She described this event as taking place in S.M.'s bathroom while S.M. was in the bath. She stated the Defendant forced her to perform oral sex during this encounter and "put his hand on [her] head and just kept on holding [her] head there." She stated they were both clothed.

Following the victim's request for a break in the interview, Ms. Stith asked the victim again about the last time the Defendant sexually abused her. The victim responded that S.M. "was in the bath," and the victim and the Defendant were in S.M.'s bedroom. Ms. Stith then asked the victim whether the Defendant had ever sexually abused outside their home, and the victim recalled that on one occasion, she accidentally broke the Defendant's "controller." The Defendant informed the victim that they would "go on a ride" and that he would "talk to [her] about it." The Defendant took the victim inside the new house and "did the same thing as before," which she clarified meant that the Defendant "touched [her] and made [her] touch him and stuff." The victim described the location of the new house but noted she did not know its address. Ms. Stith asked if this was the last time she was sexually abused, and the victim agreed that it was. Later, Ms. Stith asked the

---

[9] As stated in Qualls, this modified unanimity instruction requires that in generic evidence cases, the trial court must inform the jury that it "must unanimously agree that the State has proven beyond a reasonable doubt the commission of all of the acts described by the alleged victim" occurring within the timeframe charged in the indictment. Qualls, 482 S.W.3d at 17; see also 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.25(a).

- 32 -

victim if the Defendant had ever inserted "any other part of his body" inside the victim, and the victim recalled that at the new house on "the last time it happened," the Defendant tried to insert his penis in her vagina. She was unsure whether it entered her vagina but stated that it hurt.

At trial, the victim testified on direct examination that everything she stated in the interview was true on direct examination. During cross-examination, defense counsel extensively questioned the victim regarding which encounter was the last time the Defendant sexually abused her:

Q:   Okay. When Ms. [Stith] asked you the first time about the last time it happened, which was some time at the end of June or somewhere in that time frame, correct?

A:   Yes.

Q:   You said it was in your mom's room in the master bedroom, correct?

A:   Yes.

Q:   Okay. Is that where it happened?

A:   The first time?

Q:   The last time.

A:   The last time it happened?

Q:   Yes.

A:   I don't remember.

Q:   . . . [T]hat concerns me that you don't remember anything about the last time, because [the State] just asked you a couple of minutes ago about watching that video, correct?

A:   Yes.

Q:   And he asked you if everything you said was true, and you said yes. Do you remember that?

A:     Yeah.

Q:     But you don't remember the last time now?

A:     I don't remember it today, no.

Q:     You don't remember it today?

A:     It's fuzzy. I'm sorry.

Q:     Okay. If you don't remember it today, how do you know you were telling the truth?

A:     I don't remember it today, but everything else that I do remember from that video is the truth and the whole truth.

Q:     Okay. So you said you remember the other stuff on there is the truth and the whole truth, correct?

A:     Yes.

. . . .

Q:     [Ms. Stith] talked to you about two or three different times about the last time, correct?

A:     Yes.

Q:     And each time before that little break you said the last time was in [S.M.]'s bedroom while she was in the bathroom. Do you remember seeing that?

A:     Yes.

Q:     Okay. And then after the break Ms. [Stith] comes back into the room and starts talking to you – let me make sure I don't say it wrong. So she came back from the break and she says, ["]I have a few more questions for you.["] Do you remember when she said that on the video?

A:     Yes.

Q: And she says again, it's about the fourth or fifth time, let's talk about the last time. Okay?

A: Okay.

Q: You remember that, right?

A: Yes.

Q: She says, ["]Where was it at?["] And you said, "[I]n her bedroom. Mom was in the bath.["] You said that for about the third or fourth time, correct?

A: Yes.

Q: Okay. Then Ms. [Stith] asked you, ["]Anywhere else?["] And you were like, ["]What do you mean?["] ["]Like in another house,["] is what [Ms. Stith] asked you. And then for the first time in about forty-five minutes you said, ["]Oh, one time we took a ride and went by the new house and he did something.["] Do you remember saying that?

A: Yes.

Q: And she then followed up and says, ["]What happened at the new place?["] And you said, ["]He touched me. I touched him, and he tried to put it in me.["] Right?

A: Yes.

Q: Okay. You didn't describe to her if your clothes [were] on or off, is that correct?

A: Yes.

Q: You didn't describe to her if [the Defendant]'s clothes are on or off, is that correct?

A: Yes.

Q: And then you say, after all that, you describe the terms with great detail about how to get to the house, you said that was the last time, correct?

- 35 -

A: Yes.

Q: So It can't be the truth if the last time was at [the new house] if you told Ms. [Stith] four different times the last time was in the bedroom, correct?

A: Yes.

Q: So which time did you lie to Ms. [Stith]?

A: I don't know.

Q: You don't know which time you lied to Ms. [Stith]?

A: At [the new house] was one of the last times it happened.

. . . .

Q: Okay. You just made a comment, and I want to make sure I understand it because I don't want to put words in your mouth, but you just said that one of the last times was at [the new house], correct?

A: Yes.

Q: When was the last time?

A: I don't remember.

Q: You don't remember.

A: It was either at [the new house] or at home in [S.M.]'s bedroom, because that's where it usually happened.

Q: You did this interview and said the date up there was July 19, 2020, correct?

A: Yes.

. . . .

Q:    And you state that the last time was within the last month, possibly the Fourth of July weekend, correct?

A:    Yes.

Q:    So you've got July 19th, and the Fourth of July weekend, you're talking two or three weeks difference in time, correct?

A:    Yes.

Q:    Okay. And you're telling this jury that you did not recall the last time at [the new house] until Ms. [Stith] asked you if there was another house, and there would have been two or three weeks difference in time, correct?

A:    Yes.

Q:    That's what you're asking this jury to believe, correct?

A:    Yes.

Q:    Okay. And you would agree with me that there can only be one last time, correct?

A:    Yes.

Q:    If it's at [the new house], it can't be at [S.M.]'s, correct, at the bedroom?

A:    Yes.

. . . .

Q:    Let me ask you this: Did you ever lie to Ms. [Stith]?

A:    No.

The Defendant subsequently moved for a mistrial and requested that the trial court strike the recording of the victim's forensic interview from the record, both of which the trial court denied.

- 37 -

At the conclusion of the State's proof, the Defendant moved to compel the State to "make an election on dates and charges that are going forward in front of the jury so [he could] make a proper argument." The State responded that "the indictment speaks for itself," contending that the victim "was very clear that on or about a day in the summer of 2020, her father performed a sex act on her. And then on or about a day in the summer of 2020, her biological father performed that sex act on her[,] which would equate to the incest charge." The Defendant maintained that the victim had not testified to any such dates and again moved for the recording of her forensic interview to be stricken due to the victim's inconsistent statements regarding the last time she was raped, which he later noted that he "presume[d]" occurred during the Defendant's visit over the weekend of July 4, 2020. The State maintained that the recording of the victim's forensic interview established the dates and that "[i]f the jury's allowed to do simple addition and subtraction, they would learn that those dates fit." The trial court denied the Defendant's motion to compel an election of dates, holding that it was "not making the State elect any further than they have already in the indictment based on [the victim's] testimony. It is a question of fact." The trial court provided a standard jury instruction on the State's burden of electing an offense for the charged crimes which tracked the pattern jury instruction. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.25(a).

The State thus presented proof of two specific instances of sexual penetration upon which the jury could have rendered a verdict of guilty on a charge of rape of a child: oral sex occurring in S.M.'s bedroom while S.M. was in the bath and vaginal penetration at the new house. The victim also averred in her forensic interview that both episodes occurred during the Defendant's most recent visit to her home, which she testified at trial was during the weekend of July 4, 2020. The State nevertheless maintains that no election was required because "when viewed in the broader context of the record," the rape described as occurring in S.M.'s bedroom likely occurred around the time the Defendant moved out of S.M.'s home in spring of 2018. In support of this argument, the State notes that much of the evidence the victim presented of her sexual abuse was general and occurred on a regular basis, approximately once every one to two weeks. In light of the uncontroverted proof that the Defendant moved out of the home in spring of 2018, the State dates the majority of the abuse the victim described as occurring between 2017, when the victim was in either kindergarten or first grade, and the spring of 2018. The Defendant also agreed to this timeframe and confessed to digitally penetrating the victim before he moved away in spring of 2018.

The State argues that the rape at the new house was "the only offense that clearly occurred within the summer of 2020" and contends that the victim was unable to identify "when the last incident in [S.M.]'s bedroom occurred." This argument is not supported by the record. The victim clearly stated in her forensic interview that the Defendant last sexually abused her during his most recent visit to her home, which she testified at trial

- 38 -

was during the weekend of July 4, 2020. Both the Defendant's and S.M.'s testimonies confirm that the only time the Defendant visited the victim during this timeframe was over the weekend of July 4, 2020. Though the victim averred that the rape could have occurred a month before her July 19, 2020, forensic interview, she also admitted that she did not check the months. Additionally, the State correctly notes that the victim's description of when the Defendant moved out was inaccurate; the victim during her forensic interview stated the Defendant moved out approximately one month before. However, this detail is not pertinent to the victim's description of two specific instances of rape, both of which she stated occurred during the Defendant's visit over the weekend of July 4, 2020.

The State also posits that the victim was "certain" by the conclusion of her forensic interview that the rape at the new house was the last time the Defendant sexually abused her. This, too, is contrary to the record; the victim never disavowed her previous statement that the rape in S.M.'s bedroom was the last time, she merely described that rape at the new house as an additional last time. Further, she testified on cross-examination that she was unable to remember whether the rape in S.M.'s bedroom or the rape at the new house was the last time. Therefore, because the Defendant was charged with a single count of rape of a child occurring on a day in the summer of 2020, and because the State presented specific evidence of two offenses of sexual penetration that the victim described as occurring during the charged timeframe, an election was required to specify which instance of rape the State intended to rely upon at trial. In fact, the ambiguity surrounding the victim's descriptions of her rapes increased the need for a specific election of an offense in this case.

Having concluded that an election was required, we must now consider whether there was an election and, if so, whether it was sufficient. The indictment in this case charged the Defendant with a rape occurring on a day in summer of 2020. Following the Defendant's motion to compel an election, the State maintained that "the indictment speaks for itself," and the trial court instructed the jury to consider whether the State had proven beyond a reasonable doubt that the Defendant had committed the rape "as charged in the presentment." The State also notes that it clarified during its closing arguments that the Defendant's abuse concluded in "July of 2020." As pertinent here, the State presented the following closing argument:

> [The Defendant] stands before you charged with aggravated sexual battery, continuous sexual abuse of a child, rape of a child, and incest.
>
> . . . .
>
> The State would submit, this was a man, [the Defendant], who the State would submit is one of the most self-serving men I've ever been in the presence of. Everything he's done through the course of this case from start

- 39 -

to finish, raped his daughter. That served no one but him. Talking to the officers, deciding okay, you know, this is looking real bad, I better get the best deal I can. That didn't serve anybody but [the Defendant].

. . . .

You've heard the testimony of [the victim], now a twelve-year-old little girl[,] but at the time[, she] was ten. Very vividly, in 2020 [she] sat down with [Ms.] Stith at [Safe Harbor] and laid out what all horrible things her father had done to her from the time she was in kindergarten to first grade, which finally ended in July of 2020.

She described with great detail the things that her father was doing to her. Why would a ten-year-old little girl know these things[?] The State would submit to you she knows these things because they've been done to her. There's no reason for a ten-year-old child to know that white stuff comes out of the tip of a man's penis. The State would submit to you she knows that because this man did it to her.

The remainder of the State's closing argument focused on the Defendant's confession, contending that his will was not overborne by the detectives such that he rendered a false confession. In his closing arguments, the Defendant raised his arguments regarding the victim's inability to remember certain details about her sexual abuse, and the State responded to these claims and argued again that the Defendant's confession was truthful during rebuttal arguments.

Because the victim alleged that both rapes occurred during the Defendant's visit over the weekend of July 4, 2020, neither the election of "a day in summer of 2020" as charged in the indictment or the State's clarification of "July of 2020" were sufficient to protect the Defendant's right to a unanimous jury verdict. See Brown, 992 S.W.2d at 392 (finding the State's election insufficient where it "simply narrowed the time-frame of the charged offense from the period alleged in the indictment" rather than attempting to "clarify the victim's testimony, or clarify the conflicts in the testimony."). The State simply did not do enough to indicate to the jury whether it should consider the rape in S.M.'s bedroom or at the new house in its deliberation on the single charge of rape of a child. The State, therefore, failed to elect a specific episode of rape it intended the jury to consider during its deliberations. Accordingly, a clear and unequivocal rule of law was breached. Smith, 492 S.W.3d at 236.

The third requirement for plain error review is whether one of the Defendant's substantial rights was adversely affected by the breach of the clear and unequivocal rule of law. Rimmer, 623 S.W.3d at 255-56. As noted above, the requirement that the State make

an election serves to protect the defendant's fundamental right to a unanimous jury verdict. Smith, 492 S.W.3d at 236; Rickman, 876 S.W.2d at 828; Shelton, 851 S.W.2d at 137. The Tennessee Supreme Court has held that election errors are non-structural constitutional errors. Smith, 492 S.W.3d at 236 (citing Qualls, 482 S.W.3d at 18-20; State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)). Non-structural constitutional errors are subject to a harmless error analysis which "requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless" and did not contribute to the verdict obtained. Rodriguez, 254 S.W.3d at 371.

Although the State's failure to make an election constitutes error, that error may be harmless in certain cases. For example, in Qualls, the Tennessee Supreme Court concluded that any error in the State's failure to make an election in a generic evidence case was harmless because "the record on appeal demonstrate[d] beyond a reasonable doubt that by convicting the defendant, the jury expressed its unanimous conclusion that the victims were credible and that the defendant committed all the acts described by the victims." Qualls, 482 S.W.3d at 19. Further, the appellate courts may look to a prosecutor's statements during closing arguments to determine whether the State clarified its election by drawing the jury's attention to a specific incident to be considered during deliberations, though such statements are not, standing alone, dispositive of harmless error. Smith, 492 S.W.3d at 237-38; see also State v. Breeden, No. E2019-00983-CCA-R3-CD, 2020 WL 5638589, at *11 (Tenn. Crim. App. Sept. 21, 2020). Where the circumstances of the proof indicate that there is "no reasonable likelihood that some of the jurors may have convicted the [d]efendant based on [the victim's] vague and generalized assertions that" she was raped on "other, unspecified occasions," the State's failure to make an election may be harmless beyond a reasonable doubt. State v. Fields, No. W2018-02014-CCA-R3-CD, 2020 WL 5015902, at *10 (Tenn. Crim. App. Aug. 25, 2020). Conversely, this court has held that the failure to make an election is not harmless even when the jury accredited the victim's testimony and rejected the Defendant's theory of the case. State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001) (citing Shelton, 851 S.W.2d at 138; Tidwell, 922 S.W.2d at 501).

In State v. Clabo, 905 S.W.2d 197 (Tenn. Crim. App. 1995), the defendant was charged and convicted of two counts of aggravated sexual battery and one count of aggravated rape. At trial, the State presented proof over the defendant's objection that the defendant performed both oral and anal sex upon the victim, both of which were sufficient to prove sexual penetration. Id. at 205. Accordingly,

> The court presented to the jury the proof and allegations of two acts and asked the jury if the defendant could be convicted of one count of this act. Therefore, some jurors could have concluded that the defendant was guilty based upon the proof of the oral sex and not the anal sex, and some jurors could have concluded that the defendant was guilty based upon the proof of

the anal sex and not the oral sex. The defendant may have been convicted of a jury of less than twelve[]. Since all twelve[] members did not have to find the same facts or draw the same conclusions, we find that a grave constitutional error was committed in that the defendant may have been denied a unanimous jury verdict.

Id. This court further noted that the error was not harmless because the State argued that the defendant had committed both specific acts, the trial judge instructed the jury to rely upon the parties' arguments, and "[t]he jury instructions defined sexual penetration as including fellatio and anal intercourse." Id.

In this case, the trial court permitted the State to present proof of two instances of rape of a child over the Defendant's objection, and the evidence adduced at trial was sufficient to sustain the Defendant's singular conviction based upon either scenario. The victim described one instance of rape as the Defendant forcing her to perform oral sex upon him in S.M.'s bedroom while S.M. was in the bath, and fellatio is statutorily identified as a form of sexual penetration sufficient to sustain a conviction of rape. See Tenn. Code Ann. §§ 39-13-522 (2020), -501(7) (2020). The victim described another instance of rape as the Defendant taking her to the new house and attempting to put his penis inside her vagina. Although the victim was unsure whether the Defendant penetrated her vagina, she noted that his attempts to do so hurt, and proof of even the slightest penetration is sufficient to sustain a conviction for rape of a child. Hart v. State, 21 S.W.3d 901, 905 (Tenn. 2000) ("[T]here is . . . sexual penetration in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male.") (internal quotation marks omitted) (citing Walker v. State, 273 S.W.2d 707, 711 (1954)); see also State v. Patrick, No. M2019-02026-CCA-R3-CD, 2021 WL 2102914, at *9 (Tenn. Crim. App. May 25, 2021) (finding sufficient evidence to sustain a defendant's conviction of rape of a child where the victim testified the defendant "tried" to penetrate her anus "but was not successful."). As in Clabo, the trial court defined sexual penetration for the purposes of the jury's consideration of the charge of rape of a child as including both sexual intercourse and fellatio, and the State during closing arguments did not specify upon which act it intended the jury to consider, noting simply that the Defendant perpetuated a series of abuses against the victim, that he raped her, and that the abuse concluded in July of 2020. Having already concluded that the State's failure to elect a specific offense was error, we further conclude that the State did not remedy this error during closing arguments by drawing the jury's attention to a specific instance of conduct. Smith, 492 S.W.3d at 237-38; Brown, 992 S.W.2d at 392; Breeden, 2020 WL 5638589, at *11.

Indeed, we discern nothing in the record to support the State's argument that it sufficiently clarified one particular instance of conduct for the jury to consider in its determination. Inasmuch as the State intends to argue that any error was harmless because

the rape at the new house was the only instance of sexual penetration which "clearly occurred within the summer of 2020" because the victim was unable to identify when the rape in S.M.'s bedroom occurred with precision, we disagree for the reasons noted above and because that argument was not presented to the jury to ensure each member based its verdict on the same instance of conduct. Particularly in light of the victim's uncertainty, the State should have done more to delineate for the jury which instance of rape the State intended it to consider, and its failure to do so left some members of the jury free to convict the Defendant of rape based on fellatio occurring in S.M.'s bedroom and others free to convict the Defendant of rape based on vaginal penetration occurring at the new house. Clabo, 905 S.W.2d at 205.

Accordingly, the Defendant's right to a unanimous jury verdict was adversely affected, and the third requirement for plain error review is satisfied. There is no indication in the record to support a conclusion that the Defendant waived this issue for tactical purposes, and we can fathom no reason why he would do so, so the fourth requirement for plain error review is also satisfied. Smith, 492 S.W.3d at 238-39 ("This court has held that an absence of indicia in the trial record that a defendant has waived an issue for tactical reasons is sufficient to satisfy this criterion of plain error.") (citing State v. Gomez, 239 S.W.3d 733, 742 (Tenn. 2007); State v. Cooper, 321 S.W.3d 501, 506 (Tenn. 2010) (quotations omitted)); see also State v. Guin, No. E2022-00391-CCA-R3-CD, 2023 WL 8675582, at *7 (Tenn. Crim. App. Dec. 15, 2023), perm. app. denied (Tenn. May 16, 2024) ("[W]e can think of no tactical reason for the defendant to waive the State's obligation to elect offenses."). Finally, because the Tennessee Constitution fundamentally guarantees the criminal defendant the right to a unanimous jury verdict, consideration of this error is necessary to do substantial justice, so the fifth requirement for plain error is satisfied. We conclude that the State erred by not specifically electing an offense in this case as it related to the Defendant's prosecution for the charges of rape of a child and incest, and the trial court's failure to require an election constituted plain error. The Defendant's convictions for rape of a child and incest must be reversed, and he is entitled to a new trial.

### D. Sentencing

Lastly, the Defendant argues that his effective sentence of fifty-two years' incarceration is excessive, contending that the trial court failed to accord sufficient weight to his mitigating proof. The State responds that the trial court did not abuse its discretion in imposing within-range sentences. Although we herein reverse the Defendant's convictions of rape of a child and incest, we nevertheless will analyze the substance of his claim as it applies to each of his convictions in the event of further appellate review.

This court reviews sentencing determinations under an abuse of discretion standard. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Additionally, so long as the trial court

imposes a sentence "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles" of the Sentencing Act, the trial court's decision will be afforded a presumption of reasonableness. Id. These purposes and principles include imposing a sentence which is no greater than is justly deserved in relation to the seriousness of the offense. See Tenn. Code Ann. §§ 40-35-102(1), 40-35-103(2); see also State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). While "the sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," it should also serve as an effective deterrent to those likely to violate the law. Tenn. Code Ann. §§ 40-35-102(3)(A), 40-35-103(4).

In fashioning a defendant's sentence, the trial court must consider: (1) the evidence adduced at trial and presented at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and any arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors listed in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the Tennessee Department of Correction and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). The trial court is not required to make particularly detailed or lengthy findings; it is sufficient that the trial court "set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis" for imposing the sentence. Bise, 380 S.W.3d at 705-06 (citing Rita v. United States, 551 U.S. 338, 356-57 (2007)).

A trial court's error in the application of an enhancement or mitigating factor will not invalidate a defendant's sentence nor remove the presumption of reasonableness unless it appears from the record that the trial court wholly departed from the purposes and principles of the Sentencing Act. Bise, 380 S.W.3d at 707. In other words, a trial court's imposition of a within-range sentence will be upheld even in light of its misapplication of an enhancement or mitigating factor so long as there are other reasons consistent with the purposes and principles of the Sentencing Act. Id. The trial court is afforded discretion in its weighing of the enhancement and mitigating factors during sentencing, and a defendant's disagreement with the weight accorded these factors is not a valid ground for appeal. Id. at 706.

We first note that the Defendant's brief requests that we review the trial court's sentencing determination de novo with a presumption of correctness. This argument erroneously relies upon the pre-Bise standard of review for sentencing determinations. Today, we review a trial court's sentencing determinations for abuses of discretion and, so long as the trial court sentences the defendant within the appropriate range and properly

- 44 -

applies the purposes and principles of the Sentencing Act, its decision is presumptively reasonable. Id. at 707; see also State v. Treadway, No. E2024-00608-CCA-R3-CD, 2025 WL 252671, at *5 (Tenn. Crim. App. Jan. 21, 2025), no perm. app. filed.

The Defendant was convicted of aggravated sexual battery, rape of a child, and incest. Aggravated sexual battery is a Class B felony, and as a Range I standard offender, the appropriate sentencing range for this conviction was between eight and twelve years. Tenn. Code Ann. §§ 39-13-504, 40-35-112(a)(2). Rape of a child is a Class A felony which requires the trial court to classify the defendant as a Range II offender. Tenn. Code Ann. § 39-13-522(b)(1). Accordingly, the appropriate sentencing range for this conviction was between twenty-five and forty years. Tenn. Code Ann. § 40-35-112(b)(1). Finally, incest is a Class C felony, and as a Range I standard offender, the appropriate sentencing range for this conviction was between three and six years. Tenn. Code Ann. §§ 39-15-302(b) (2021) (subsequently amended), 40-35-112(a)(3). The trial court imposed maximum sentences for each of the Defendant's convictions, and our review of the record indicates that it did so after consideration of the purposes and principles of the Sentencing Act. We will, therefore, accord the trial court's sentencing determination the presumption of reasonableness.

The sum of the Defendant's argument on appeal is that the trial court gave insufficient weight to the mitigating proof of his lack of a criminal record and his previous military service. However, the 2005 amendments to the Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008). Accordingly, the Defendant's disagreement with the trial court's weighing of the mitigating evidence is not a valid ground for relief. Id. at 345; Bise, 380 S.W.3d at 706. Because we find no basis to conclude that the trial court abused its discretion in imposing maximum sentences in this case, the Defendant is not entitled to relief on this claim.

## III. Conclusion

Following our review, we reverse the Defendant's convictions of rape of a child and incest and remand for a new trial on those charges. The judgments of the trial court are affirmed in all other respects.

s/ W. MARK WARD
W. MARK WARD, SPECIAL JUDGE

- 45 -